TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, Appellant, v GWATHMEY SIEGEL AND ASSOCIATES ARCHITECTS, Defendants, and MORSE/DIESEL, INC., Respondent.

First Department, May 21, 1991

**APPEARANCES OF COUNSEL**

*Mark P. Ladner* of counsel *(Jack C. Auspitz, Claire Silber-*

*man, Howard A. Jacobson* and *Jo-Anne Weissbart* with him on the brief; *Morrison & Foerster,* and *Columbia University Office of General Counsel,* attorneys), for appellant.

*Frederick R. Rohn* of counsel *(Jeffrey S. Parker* with him on the brief; *Sacks Montgomery, P. C.,* attorneys), for respondent.

OPINION OF THE COURT

MILONAS, J. P.

Plaintiff Columbia University and defendant-respondent Morse/Diesel, Inc. entered into a construction agreement on June 15, 1978 pursuant to which the latter was to serve as construction manager for certain proposed East Campus housing, consisting primarily of a dormitory complex with additional office and conference areas. In that regard, defendant was charged with responsibility for the entire project from the preparation of the first drawing through the completion of construction, as well as the procurement of all necessary permits. The actual building commenced in 1979, and, by 1981, Columbia, confronting an acute housing shortage, began transferring people into parts of the East Campus in January and February of that year. A temporary certificate of occupancy was thereafter obtained. According to plaintiff, the new housing was only minimally habitable, and it was accepted, even by Morse/Diesel, that more work would be required after the students had moved in. Other sections of East Campus, Columbia states, remained vacant until much later since the need for the space was not immediate. Yet, one of the codefendants in this case, Charles Gwathmey of Gwathmey Siegel & Associates, Architects, wrote in a letter of December 21, 1983, that "[i]n context, Morse/Diesel used the 'move in' of students when the project was unfinished to deny responsibility for punch list items." In any event, such a punch list of uncompleted or faulty matters was prepared, with new items continuing to be appended as their existence became apparent.

It is the contention of Morse/Diesel that it tendered the project to Columbia on October 12, 1981 as substantially complete pursuant to section 7.5 of Part B of the subject contract, which mandated plaintiff either to accept the work as is or provide a deficiency list. Defendant asserts that "substantial completion" means, in construction industry usage, the point at which the owner can occupy or utilize the premises for their intended purposes, and this, it insists, had long before been attained. Moreover, Morse/Diesel urges,

Columbia did not basically dispute that the project was substantially complete although it admits that there were still some open items on the punch list as of March 28, 1982. However, defendant claims that most of these matters involved repair or corrective work to previously installed aspects of the construction. Morse/Diesel does concede that there were a number of details, particularly the replacement of bathroom tiles in the dormitory bathrooms, that remained unfinished until 1983 and ultimately required more work than had been initially anticipated. Plaintiff, in contrast, argues that five major aspects of the project, whose magnitude was not fully revealed on Morse/Diesel's punch list, along with other miscellaneous items, were still not completed by March 28, 1982. These matters consisted primarily of (1) arcade deck leaks, (2) arcade ceiling leaks, (3) facade leaks, (4) ponding in the plaza of the School of International and Public Affairs (S.I.A.), and (5) replacement of the bathroom tiles.

Notwithstanding defendant's allegation that Columbia accepted its formal notice that the contract work was substantially complete, plaintiff's project manager responded on October 30, 1981 that "[t]he Morse Diesel letter of 10/12/81 advising of 'substantial completion' is somewhat premature. I have reviewed our punch list of 7/28/81 and the followup letter of 10/5/81 and find a sizable portion of those lists open and/or incomplete." On November 9, 1981, defendant replied that of the 210 items deemed unfinished by Columbia, "only approximately 100 remain open. Many of these open items are in progress. * * * Please rest assured that every possible effort is being made to complete the remaining items. However, it is quite apparent that with only these few items remaining open on a project of this magnitude, the overall contract work and corrective work indicated on the Punch List dated July 28, 1981 can be considered substantially complete." Columbia rejected Morse/Diesel's position in a letter dated December 29, 1981 in which its project manager reminded defendant that it had previously complained of many unsatisfied deficiencies, some of them being "very significant" and including "leaks through the arcade into the undeveloped space below, ponding of water on the S.I.A. Plaza and trailer removal. As the cost for completing these and other items will be quite large, I suggest that we discuss whether the project can be considered substantially complete at our next meeting."

In its next communication, dated January 8, 1982, Morse/

Diesel lectured Columbia as to the meaning of substantial completion. It then observed that the "completion of punch list items has been an ongoing procedure as portions of the building were made available for occupancy." The various lists, defendant claimed, "were compiled with the understanding and cooperation of your representative, with the items listed thereon completed as they appeared. On July 28, 1981, we received the 'final punch list' from your office which incorporated not only those items remaining from previous lists, but included new items discovered during the rise and occupancy of the building." Defendant, moreover, accused Columbia of hindering its efforts by refusing to make timely progress payments as necessitated by their contract. Nonetheless, it concluded, "not only has substantial completion been achieved, but final completion is immanent [sic]." Thereafter, Morse/Diesel advised Columbia, in a letter dated January 25, 1982, that it had prepared a final punch list containing 108 items and inviting plaintiff to offer any additions. Columbia's project manager wrote back on March 8, 1982 that "[w]e forward herewith your 'boiled' down list annotated as requested. Two additional sheets are included showing five (5) new items and 23 other items not included on your list. This second listing reminds us of problems encountered during the course of the project, but which remain incomplete or uncorrected." Two days later, defendant's project manager noted in an internal memorandum that work valued at $39,120, as indicated on five attached sheets, had not yet been done. Another internal memorandum ensued on April 13, 1982, again referring to a revised punch list, on this occasion stating that the "dollar value of this work is difficult to determine. This is due to the approval of some scope changes not being paid for, etc. We should carry a safe amount of $50,000 to $75,000 to complete."

Significantly, the leakage problems evidently plaguing the project, which plaintiff attributes to defective work, persisted well into 1982 and was still mentioned on the punch list in April of that year. Indeed, Morse/Diesel itself acknowledged the seriousness of the situation with respect to the arcade deck to its subcontractor, defendant Port Morris Tile & Terrazzo Corp. At one point, the company admitted that "the trenching done by us [was] not sufficient", and 2,000 cubic feet of the arcade deck were eventually replaced. Columbia asserts that this task was not finished until September of 1982. Simultaneous with the difficulties concerning the arcade deck,

plaintiff was also experiencing trouble with leaks in the arcade ceilings. During the winter of 1980-1981, pipes in these ceilings repeatedly froze and burst as a result of improper insulation, and Morse/Diesel's work here was not completed until May of 1982. Correcting the various arcade deficiencies, Columbia asserts, created such severe disruption that on occasion it was almost impossible for students to enter East Campus.

Also afflicting the construction was water seepage through the facade into the interior of the complex. Columbia retained the consulting firm of Peter Corsell Associates, Inc. to investigate the source of the leaks, a process in which Morse/Diesel participated. Corsell determined that water was leaking through the grout joints and that the problem could be rectified by sealing or waterproofing the joints. Plaintiff ultimately hired Port Morris to apply its treatment method at a cost of $190,750. The bulk of the work, which because of adverse weather conditions, could not be undertaken until May of 1982 and continued through that summer. Further, the job entailed the erection of scaffolding around the entire building, complicating the ability of the students to traverse the area while the repairs were in progress.

After Columbia first advised Morse/Diesel of a significant drainage or ponding problem on the S.I.A. Plaza, the defect remained on the punch list into April of 1982. Finally, the university and defendant agreed that plaintiff would retain other contractors to correct the problem, thus reducing the amount payable to Morse/Diesel. The eastern portion of the plaza, consisting of several thousand square feet, subsequently had to be ripped up and rebuilt. This work was not completed until many months after March 28, 1982 and also purportedly interfered with the lives of the East Campus residents. The last major defect, the problem with the bathroom tiles, ultimately entailed the replacement of floor tiles in half of the 170 bathrooms and the replacement of wall tiles in 123 bathrooms. This job Columbia urges, was not even commenced until September of 1982 and continued into 1983.

As for the question of expense, according to plaintiff the $50,000 to $75,000 estimate by Morse/Diesel did not take into account the high costs associated with the arcade deck leaks, at least part of the arcade ceiling leaks, the S.I.A. Plaza ponding and most of the defective bathroom tiles. In fact, because of the amount of work still outstanding well into 1982, defendant was unable to acquire municipal certificates

of fire department approval and electrical inspection until March 26, 1982 and April 28, 1982, respectively, and the permanent certificate of occupancy was not issued until June 11, 1982. Columbia also asserts that due to discrepancies between the certificate of occupancy and the project's actual specifications, a corrected certificate had to be obtained on August 18, 1982.

Following the fall of a big chunk of the East Campus facade into the interior courtyard in February of 1988, plaintiff instituted this action against Morse/Diesel and other defendants to recover both compensatory and punitive damages for the supposed faulty design and construction of the East Campus facility. Columbia contends that large parts of the facade of the complex have collapsed and the rest is also in danger of collapsing, compelling the replacement of the entire exterior at an estimated cost in excess of $10 million. The complaint, which was served on March 28, 1988, alleges breach of contract, construction of the facade in a negligent and defective manner and the creation of an unreasonably dangerous, unsafe and defective condition. Although only limited discovery has thus far occurred, the Supreme Court granted defendants' motion for summary judgment dismissal pursuant to CPLR 3212 on the ground that plaintiff's claims are time barred as a result of the applicable six-year Statute of Limitations (CPLR 213). The court, in rendering its decision, held that since a "cause of action for deficiencies in construction has been established as the completion of 'actual physical work' ", and "extensions past the time of substantial completion are not permissible under General Obligations Law § 17-103", the October 12, 1981 date advanced by defendants as the time when substantial completion took place was operative for limitations purposes. The court, however, did not reach defendants' other arguments that Columbia was precluded from bringing its action on the basis of acceptance of the work and also that some of the claims failed to state a cause of action.

While it is true that "[a] cause of action against a contractor for defects in construction generally accrues upon completion of the actual physical work" (Cabrini Med. Center v Desina, 64 NY2d 1059, 1061; see also, Bayridge Air Rights v Blitman Constr. Corp., 160 AD2d 589), defendants, in pleading the Statute of Limitations, have raised an affirmative defense for which they have the burden of proof (see, Goncalves v Regent Intl. Hotels, 58 NY2d 206; Manion v Pan Am. World Airways, 55 NY2d 398; see also, Cooke, Ch. J., dissenting in part in

*Phillips Constr. Co. v City of New York,* 61 NY2d 949, 953). It appears that defendants herein have taken the position, and the Supreme Court agreed, that occupancy of the premises is equivalent to substantial completion. Yet, occupancy, partial or full, is simply a factor to be considered in ascertaining whether there has been completion *(see, Yeshiva Univ. v Fidelity & Deposit Co.,* 116 AD2d 49); it is by no means determinative, particularly where, as herein, Columbia expressed, in a persistent and unmistakeable fashion, its dissatisfaction with major portions of Morse/Diesel's performance.

Notwithstanding that students had moved into the subject housing, work on the East Campus continued all through 1982 and even into 1983 and extended to such matters as reconstruction of the arcade deck to correct serious leaks, reinsulation of the pipes, waterproofing treatment, and replacement of bathroom tiles, even entailing the erection of scaffolding. Under these circumstances, it was improper for the Supreme Court to accept at face value Morse/Diesel's assertion that the project was substantially complete on October 12, 1981 merely because, on that date, it had characterized the situation as such to Columbia. Moreover, plaintiff strongly disputes Morse/Diesel's claim, and there is more than sufficient evidence in the record to demonstrate that there may be merit in Columbia's position. At the very least, there exists an unresolved question of fact as to whether the work on the East Campus was substantially complete prior to March 28, 1982, the relevant date insofar as the Statute of Limitations is concerned, and whether the university ever accepted that work. It should be pointed out that the students' moving into the premises cannot, by itself, be construed as an acceptance. Certainly, summary judgment dismissal was inappropriate where the papers submitted in connection with this case do not support as a matter of law defendants' contention with respect to either of these issues.

Consequently, the order of the Supreme Court, New York County (Irma Vidal Santaella, J.), entered on or about June 22, 1990, which granted defendant Morse/Diesel's motion pursuant to CPLR 3212 for summary judgment dismissing the complaint, should be reversed, on the law, and the motion denied, with costs and disbursements.

KUPFERMAN, ASCH, KASSAL and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on or about June 22, 1990, is reversed, on the law, and defendant Morse/Diesel's motion pursuant to CPLR 3212 for summary judgment dismissing the complaint denied, with costs and disbursements.